COURT OF APPEALS OF VIRGINIA

Present:  Judges Elder, Lemons[*] and Senior Judge Cole
Argued at Richmond, Virginia


RONALD CLYDE IVERSON

                                  MEMORANDUM OPINION[**] BY
v.    Record No. 0314-99-2         JUDGE DONALD W. LEMONS
                                       APRIL 25, 2000
THERESE ROSE IVERSON


FROM THE CIRCUIT COURT OF MADISON COUNTY
John R. Cullen, Judge

      Donald K. Butler (Ann Brakke Campfield;
      Rae H. Ely; Morano, Colan & Butler; Rae H.
      Ely & Associates, on briefs), for appellant.

      Annie Lee Jacobs (Tracey C. Hopper; Parker,
      McElwain & Jacobs, P.C., on brief), for
      appellee.


Ronald Iverson ("husband") appeals certain portions of a divorce decree entered by the Circuit Court of Madison County. Incorporated into that court's November 4, 1998 decree were the findings of fact and conclusions of law from an opinion letter dated September 10, 1998.

---

[*] Justice Lemons prepared and the Court adopted the opinion in this case prior to his investiture as a Justice of the Supreme Court of Virginia.

[**] Pursuant to Code § 17.1-413, recodifying Code § 17-116.010, this opinion is not designated for publication.

## I.   BACKGROUND

Therese Iverson and Ronald Iverson married on July 9, 1966 in Chicago, Illinois.  Husband owned Iverson Perennial Gardens ("IPG").  Wife worked outside the home from the time of the parties' marriage through 1989, the last six years working for IPG as an employee.

In 1996, husband sold IPG to Hines Horticulture for $10,250,000 plus payments of $75,000 per year pursuant to a three-year consulting agreement, under which husband worked approximately 20-30 days per year and was prohibited from selling plants in the United States for the three-year period beginning August 30, 1996.

The subject of this appeal concerns either the valuation or distribution of the following properties:

1.  Edgewood Farm, an 1853 Greek revival home that the Iversons purchased and renovated in Madison County, Virginia. Upon divorce, it was valued at $1,500,000 and was subject to two mortgages totaling $694,793.94.  Wife sold Edgewood Farm after the September 10, 1998 opinion letter, but before entry of the final decree on November 4, 1998.

2.  Three tracts of land in Illinois, including:  a 34.286 acre property located in Lake County and valued at $1,300,000; a 24.59 Lake County property valued at $4,000,000; and a 69.62 acre Kane County property valued at $975,000, less a mortgage balance of $264,080, resulting in $710,920 net equity subject to

-

division. After the hearing, husband sold a portion of the Kane County property.

3. A villa in St. Martin valued at $900,000.

4. Property in Trenton, South Carolina valued at $65,000, less a mortgage balance of $46,000 resulting in $19,000 net equity subject to division.

Wife filed a Bill of Complaint for divorce on August 2, 1996. In the divorce decree of March 2, 1998, the court reserved jurisdiction to resolve equitable distribution and spousal support. At the time of the hearing, the parties' primary assets derived from the sale of IPG that was invested in Oppenhiemer accounts, the Illinois real estate, a villa in St. Martin and Edgewood Farm.

After taking evidence <u>ore</u> <u>tenus</u> over five days, the court found that the marital assets had a total value of approximately $9,872,000. The trial court ordered that the value of assets not connected with IPG be divided equally between the parties and that assets related to IPG be allocated 65% to husband and 35% to wife. The court further found that husband had wasted certain assets during the parties' separation and charged him with the value of those assets. Husband received net assets (exclusive of tangible personal property) which the trial court valued at approximately $5,903,000, and wife received assets (exclusive of tangible personal property) which the trial court valued at approximately $3,873,000.

-

On appeal, husband contests certain portions of the decree entered November 4, 1998 by the Circuit Court of Madison County.[1]

## II. EQUITABLE DISTRIBUTION

"Fashioning an equitable distribution award lies within the sound discretion of the trial judge and that award will not be set aside unless it is plainly wrong or without evidence to support it." Srinivasan v. Srinivasan, 10 Va. App. 728, 732, 396 S.E.2d 675, 678 (1990); Code § 8.01-680. In matters of equitable distribution, a court must classify the property as separate or marital, assign a value to the property based on the evidence presented by both parties and, finally, distribute the property to the parties, considering the factors present in Code § 20-107.3(E). See Marion v. Marion, 11 Va. App. 659, 665, 401 S.E.2d 432, 436 (1991).

On appeal, husband maintains that the trial court erred by: (1) valuing the 24.59 acre parcel of land in Lake County, Illinois at $4,000,000; (2) allocating certain tax liabilities to him; (3) failing to consider the liquidity of certain assets; and (4) awarding spousal support without proper consideration of his change in income in 1999, wife's expenses and the income earning character of the assets distributed. Finding no reversible error, we affirm the decree.

---

[1] The finality of that decree was suspended by subsequent orders of the court to allow husband time to transfer real estate and post an appeal bond.

-

A.   Valuation of the 24.59 acre tract at $4,000,000

The trial court accepted wife's expert's opinion that the 24.59 acre Lake County tract was valued at $4,000,000. Approximately 68% of the 24.59 acres is located within the Village of Long Grove and is zoned R-2 (residential) which permits residential use with a maximum density of one lot per two acres.[2]   The remaining 7.84 acres is in unincorporated Lake County and is currently zoned C (countryside/agricultural). James Gibbons, a Chicago real estate appraiser, testified as wife's expert in valuation.  He testified that these 24.59 acres had a value of $4,000,000 based on a sales comparison valuation approach and other factors.  He arrived at this conclusion assuming the highest and best use of the property would require the owner to annex the unincorporated portion into the Village of Long Grove, demolish the existing improvements, and develop the site with a mixed-use commercial development plan commensurate with Long Grove's comprehensive plan.  He also based his conclusion in part on sales comparisons, financial statements given by Mr. Iverson to a bank and a farm credit organization, and an offer to purchase.

In reaching the "Fee Simple Market Value" opinion wife's expert stated, "the three commonly-used approaches to value are

_____

[2] Long Grove is a small affluent community with an average household income of $160,000 and an average home price of $365,000.  Houses built within the past three years have been in the $1,000,000 range.

-

the Cost, Income Capitalization, and Sales Comparison

Approaches.  Since the improvements were determined to not have

contributory value to the underlying land value, the Cost and

Income Approaches were not applicable."

Under "purpose and intended use of appraisal" the expert

stated:  "The purpose of this appraisal is to estimate the

Market Value (as defined on the following page) of the subject

property.  The intended use of this appraisal is to provide the

Client with a Market Value estimate for purposes of a division

of marital assets."

"Market Value" is defined in the expert's report as:

> The most probable price which a property
> should bring in a competitive and open
> market under all conditions requisite to a
> fair sale, the buyer and seller each acting
> prudently and knowledgeably, and assuming
> the price is not affected by any undue
> stimulus.  Implicit in this definition is
> the consummation of a sale as of a specified
> date and the passing of title from seller to
> buyer under conditions whereby:
>
> 1.  Buyer and seller are typically
> motivated:
>
> 2.  Both parties are well informed or well
> advised, and acting in what they consider
> their best interests;
>
> 3.  A reasonable time is allowed for
> exposure in the open market;
>
> 4.  Payment is made in terms of cash in U.S.
> dollars or in terms of financial
> arrangements comparable thereto; and
>
> 5.  The price represents the normal
> consideration for the property sold

-

> unaffected by special or creative financing
> or sales concessions granted by anyone
> associated with the sale.

The expert further noted:

> Although currently zoned low-density
> residential, per the Village of Long Grove's
> Comprehensive Plan (dated 8/27/91), the
> subject property is one of 4
> commercially-oriented planning subareas that
> are covered by detailed plans within the
> Comprehensive Plan.  The Plan states that
> "these special subarea plans also should
> serve as a guide for the future development
> of such important Village areas."

Husband contends that the valuation is speculative because:

1.  Development of the land requires the widening of a neighboring highway, the addition of turning lanes and the addition of signal lights.

2.  Municipal water and sewer is not currently available on the site.

3.  Based on its soil type, there would be additional costs to establish proper foundations for construction.

4.  A portion of the property is in a wetland and could not be developed without a permit from the Army Corps of Engineers.

Husband's expert witness, Ronald Keating, a real estate broker from Chicago, testified as to his familiarity with this property, both as a prospective purchaser and as the listing real estate agent.  His firm was initially interested in developing these 24.59 acres for retail, office and industrial use and spent three years exploring its development potential.

-

However, according to Keating, officials from the Village of Long Grove refused to support any type of commercial development on this property. Keating explained that Long Grove is an area of the state where growth is neither encouraged nor wanted. His firm spent over $100,000 in preparing site plans and engineering studies to determine its development potential.

Keating listed the property for sale and marketed it for two years. Hamilton Partners eventually submitted an offer to purchase this land plus 3.15 acres of Iverson's 34.286 acre tract. This offer was contingent upon husband's cooperation in obtaining new zoning and upon the annexation and rezoning of another 25 acres owned by a third party so that the total acreage could be developed together into a single family residential subdivision. The offer was rejected in part because of contingencies and in part because of price.

Keating testified that after two years as the listing agent, no viable purchasers had come forward for the property. Keating's opinion was that he could market the 24.59 acre parcel and the 34.286 acres parcel together with no contingencies to sell within one year for a price of $500,000.[3]

Wife's other evidence of the value of the property consisted of the offer by Hamilton Partners in August, 1997 to purchase the 24.59 acre parcel (together with 3.15 acres of the

_____

[3] This represents an average value of approximately $8,492 per acre.

-

34.286 acre parcel) for the sum of $3,652,506.  In addition,

husband had signed a financial statement on August 15, 1995,

under penalty of federal criminal prosecution certifying that

the value of the Long Grove real estate was $3,500,000 and a

second financial statement on February 1, 1996, showing the

value of the Long Grove property at $3,500,000.  Furthermore,

husband had previously offered $62,500 per acre for an adjoining

property similarly situated, and an earlier listing of the 24.59

acres for sale at $170,000 per acre or $4,180,300.  Finally,

there was a current listing of the same 24.59 acres, plus an

additional 22.41 acres, at $5 per square foot or $6,087,510.

    The trial judge noted:

> Each of the experts testified extensively as
> to his valuation of the properties and the
> basis for his opinion.  In addition,
> numerous exhibits were introduced to support
> the position of the parties and the experts
> as to value.  Mr. Keating's opinion as to
> the values for the properties is far less
> than the current listing price on the 34.286
> acre parcel and the 24.59 acres, and the
> listing price on the 69.62 acre parcel when
> that listing expired a year ago.  Mr.
> Keating's values are also much less than the
> market values placed on the properties by
> Mr. Iverson as contained in his financial
> statements for Nations Bank dated August 15,
> 1995, and Palmetto Farm Credit dated
> February, 1996.

    On appeal the evidence is considered in the light most

favorable to the party prevailing in the trial court.  "'Where

the trial court's decision is based on an ore tenus hearing, its

determination will not be disturbed on appeal unless plainly

-

wrong or without evidence to support it.'"  Gamble v. Gamble, 14

Va. App. 558, 563, 421 S.E.2d 635, 638 (1992) (quoting

Schoenwetter v. Schoenwetter, 8 Va. App. 601, 605, 383 S.E.2d

28, 30 (1989)).  "Where experts offer conflicting testimony, it

is within the discretion of the trial court to select either

opinion."  Rowe v. Rowe, 24 Va. App. 123, 140, 480 S.E.2d 760,

768 (1997).

Husband maintains that the valuation placed upon the

property by wife's expert was speculative and should have been

rejected.  Husband notes that the valuation is based in part

upon an offer to purchase that required rezoning, annexation by

the Village of Long Grove, acquisition of property not belonging

to husband and other contingencies.  Additionally, husband

points to the use of comparable properties for valuation and

argues that the properties utilized were dissimilar in nature.

However, wife's valuation is based on much more than these

factors.

Wife's expert, Gibbons, possessed the designation "MAI"

(Member of the Appraisal Institute) and presented detailed

written appraisals of the property in addition to his testimony.

Among the factors utilized by Gibbons were:

a.  Husband's two financial statements under oath listing

the value of the property at $3,500,000, two years prior to

the date of valuation in this case;

-

b.  Husband's offer to purchase adjacent property at $62,500 per acre;

c.  Husband's earlier listing for the sale of the property at $170,000 per acre for a total of $4,180,300;

d.  Husband's current listing for the sale of the property at $6,087,510;

e.  The Hamilton Partners' offer to purchase the property (plus 3.15 acres of adjoining property owned by husband) for $3,652,506 (with many contingencies) which was rejected in part because of contingencies and in part because of price, and

f.  Comparable properties.

Husband's expert was the listing agent for the property and valued the property at $500,000 despite a current listing price of $6,087,510.  We cannot say that the trial judge was plainly wrong or without evidence to support his judgment accepting the valuation of wife's expert.

## B.  Allocation of tax liability

The trial court divided the marital assets so that wife received 35% and husband 65% of those assets connected with IPG, including the value of the real estate in Illinois and South Carolina, the accounts receivable from the sale, other IPG related assets and the bank and stock accounts containing the remaining proceeds from the sale of the business.  The trial court ordered that wife pay 35% of the 1998 income taxes

-

attributable to marital accounts and that husband pay the remainder of the income taxes for 1998.  The trial court further ordered husband to pay all remaining income taxes, penalties or interest for 1997 and prior years for the "parties jointly, for himself personally, for the corporations, partnerships, or other business entities in which he then had any interest," and also entitled him to any refund due.  Husband contends that he is now facing a potential tax liability of $2,000,000.

When considering valuation of the marital estate, "Code § 20-107.3 'mandates' that trial courts determine the ownership and value of all real and personal property of the parties." Johnson v. Johnson, 25 Va. App. 368, 373, 488 S.E.2d 659, 662 (1997).  The litigants, however, have the burden of presenting sufficient evidence for the court to discharge its duty.  See id.  The court will "look to current circumstances and what the circumstances will be 'within the immediate or reasonably foreseeable future,' not to what may happen in the future." Srinivasan, 10 Va. App. at 735, 396 S.E.2d at 679 (quoting Young v. Young, 3 Va. App. 80, 81-82, 348 S.E.2d 46, 47 (1986)).

At the time of trial, husband had not completed his 1996 and 1997 tax returns.  Husband's accountant testified that the IRS was "delving into" certain issues, that the IRS had requested documents, and that he had discussed certain matters with an IRS agent.  He also put the tax liability at about $200,000 to $300,000 for 1992 and about $40,000 for 1995.  The

-

only other information on this subject before the court was a Motion to Reconsider Allocation of Tax Liabilities and Expenses to the Parties filed by husband's counsel, together with an attached letter from husband's accountant asserting that, as of September 12, 1998, he was still "working with" the IRS and that husband "[is] looking at a potential tax liability of almost $2,000,000." The motion was filed after the court rendered its decision.

On January 6, 1998, the trial court gave the parties leave to present additional evidence about outstanding tax matters. Evidence was presented that $1,656,000 of marital funds had been paid to the IRS and the Virginia Department of Taxation for corporate taxes potentially owed for 1996. On June 20, 1998, the trial court ordered, prior to its equitable distribution ruling, that $474,115 of marital funds be paid toward husband's individual federal and state income tax returns for 1997. By letter to counsel of June 26, 1998, the court requested additional evidence of tax consequences. The September 10, 1998 opinion letter expressly mentioned the court's having asked the parties post-trial to present their respective positions to the court about tax matters.

The trial judge, in his letter opinion and in court prior to the entry of the decree, specifically stated that he had considered all of the factors of Code § 20-107.3 in fashioning the equitable distribution award and explained his reasoning

-

about the various factors.  While it is true that husband has received a significantly higher percentage of the tax liability, this alone does not indicate an improper division between the parties.  Virginia's statutory scheme of equitable distribution does not have a presumption favoring an equal distribution of assets or liabilities.  See Papuchis v. Papuchis, 2 Va. App. 130, 132-33, 341 S.E.2d 829, 830-31 (1986).

Fashioning an equitable distribution award lies within the sound discretion of the trial judge and that award will not be set aside unless it is plainly wrong or without evidence to support it.  See Srinivasan, 10 Va. App. at 732, 396 S.E.2d at 678.  In making his equitable distribution award the trial judge issued a written letter opinion and further explained his ruling orally to the parties prior to the entry of the decree.  The twenty-three page letter opinion clearly demonstrates consideration of the statutory factors required in making an equitable distribution award.  The court specifically requested counsel to provide evidence concerning potential tax consequences.  The burden is upon the parties to provide sufficient evidence to the trial court from which to make an equitable distribution award.  See Johnson, 25 Va. App. at 373, 488 S.E.2d at 662.

Prior to its letter opinion, evidence regarding tax consequences in the record in response to the invitation of the trial court was limited to "federal and state income taxes for

-

the years 1996 and 1997 may not be finalized" although

substantial "payments ha[d] been made," and "the 1996 tax year

[was] being audited."  After the trial judge issued his letter

opinion, husband filed a "Motion to Equalize the Equitable

Distribution Valuation Risks to Each Party and to Value all Real

Estate Consistent with their Net Values" and "Motion to

Reconsider Allocation of Tax Liabilities and Expenses to the

Parties."  At a hearing on the motions, the trial court stated:

> The Court considered the tax liability of
> the parties on the evidence that was
> presented to it, and back in June the Court
> was ready at that time to finalize its
> opinion, this opinion went through several
> drafts, the Court reviewed all the evidence
> in what I would call great detail, . . . .
> And the Court is not going back now and
> recalculate these figures. . . .  The Court
> believes that its ruling was supported by
> the evidence, and I'm not going to
> reconsider the allocation of either the tax
> liabilities or the expenses of the parties,
> particularly in light of the fact that the
> Court awarded a distribution that was not a
> 50/50 distribution, all those issues were
> before the Court when it ruled.

Based upon the evidence before the trial judge after

specific invitation to address tax consequences to the parties,

we cannot say that the trial judge was plainly wrong or without

evidence to support his ruling that the proceeds of the sale of

IPG would be split 65% to husband and 35% to wife with tax

liability for the 1998 federal and state income tax in

proportion to the division but with all other tax liability or

refund being the responsibility or the benefit of husband.

-

Given the opportunity to present evidence on the issue prior to the trial court's ruling, we do not consider it an abuse of discretion to deny the motion to reconsider.

Having considered the tax consequences to each party in making the equitable distribution award, the trial court was not required to frame its ruling to minimize or eliminate all negative tax consequences to husband.  See Code § 20-107.3(E)(9).  Accordingly, we find no reversible error on these grounds.

### C.  Did the trial court err by failing to consider the liquidity of assets?

Pursuant to the trial court's equitable distribution award, husband retained marital assets with a total value of approximately $8,003,000, less payment to wife of a lump sum of $2,100,000.  The court permitted him to satisfy a portion of the award by transferring to her the 34.286 acres in Lake County, Illinois, valued at $1,300,000 and 20.05 acres in Kane County, Illinois, valued at $280,700.[4]  Husband elected to transfer these portions to wife.  After the transfers to wife and adjustment for the lump sum payment, husband retains assets valued by the court at approximately $5,903,000, and wife receives assets

---

[4] This was the remaining acreage from the 69.62 acres in Kane County that existed at the time of the hearing.  Husband sold a portion of this property prior to the entry of the decree.

-

valued by the court at approximately $3,873,000 plus tangible personal property.[5]

On appeal, husband contends that he received illiquid assets that may be worth less that the value established by the court. According to husband, wife received assets with greater liquidity.

The two largest assets transferred to wife were Edgewood Farm and the St. Martin real estate. The court found the net equity in Edgewood Farm to be $805,206. This property was sold prior to the entry of the decree. The St. Martin real estate was valued at $900,000. This was investment property in a complex that had a rental manager. Wife also has received or will receive a cash lump sum from husband of $519,300.

The trial court specifically found that all the parties' real estate is non-liquid. The asset that husband received with the greatest value was the 24.59 acre parcel in Lake County, Illinois. Husband claims this land is illiquid because he has unsuccessfully tried to sell it for approximately five years. Edgewood Farm was sold after the judge's opinion letter but prior to entry of the decree. Likewise, the majority of Kane County property allocated to husband was sold prior to entry of the decree. Husband received 65% of the bank and investment account assets; as of the date of trial those accounts were the

[5] She also retains 100% of her interest in a pension plan that will provide monthly payments at age 65.

-

only liquid assets of the parties and husband received most of them.  The other assets allocated to husband included accounts receivable from Josh Batist and Marlene Frisbee and a promissory note from Karen Zaucha.[6]

When fashioning an equitable distribution award, the trial court is not required "to quantify or elaborate exactly what weight or consideration it has given to each of the statutory factors [of Code § 20-107.3(E)]."  Woolley v. Woolley, 3 Va. App. 337, 345, 349 S.E.2d 422, 426 (1986).  The trial court's allocation of liquid and non-liquid assets is a matter of discretion.  Nowhere does the law require parties to receive a proportionate or equal share of the liquid and the non-liquid assets.  The court is required only to consider "the liquid or nonliquid character of all marital property."  Code § 20-107.3(E)(8).  The record reflects that the trial court did consider this factor.

## D.  Spousal Support

The trial court awarded wife $1,700 per month as spousal support.  Husband assigns error to that determination based on three grounds.  We dispose of each ground in turn.

First, husband claims that the court incorrectly considered his earning capacity.

---

[6] The value of the Accounts Receivable from Josh Batist and Marlene Frisbee are worth $12,000 and $40,000 respectively.  The total debt of Karen Zaucha is worth $192,503.29.

> When considering the issue of spousal
> support, whether in a modification or
> initial award determination, the trial court
> must take into account the receiving
> spouse's needs and ability to provide for
> the needs, and balance those against the
> other spouse's ability to provide support,
> even when the payor spouse has retired in
> good faith at a "normal" retirement age.

Stubblebine v. Stubblebine, 22 Va. App. 703, 710, 473 S.E.2d 72, 75 (1996) (en banc); see Code § 20-107.1. "The trial court . . . may consider earning capacity as well as actual earnings in fashioning the award so long as it applies 'the circumstances in existence at the time of the award.'" Stubblebine, 22 Va. App. at 708, 473 S.E.2d at 74 (quoting Payne v. Payne, 5 Va. App. 359, 363, 363 S.E.2d 428, 430 (1987)).

In Stubblebine, the husband was sixty-four years old, had twice retired during the marriage, and was a part-time consultant during his retirement when the marriage disintegrated and the parties separated. During the divorce, both of his consulting contracts were terminated. Nevertheless, this Court held that Mr. Stubblebine was capable of gainful employment and "regardless of whether [he] had chosen a more relaxed retirement rather than pursuing an active retirement, the fact remain[ed] that he [was] capable of gainful employment." Id. at 711, 473 S.E.2d at 76.

"In determining the amount of an award, the court must consider all of the factors set forth in Code § 20-107.1. The court's decision is presumed correct and will not be disturbed

-

unless some injustice has been done," or unless the decision is contrary to the evidence or plainly wrong.  Id. at 707, 473 S.E.2d at 74.  At the time of the award, husband was employed and earned $75,000 annually as a consultant.  He admitted that he earned that amount working 20 or 30 days over a twelve-month period.  He indicated his intention to work out of his home in Madison County and once his income from the consulting contract with Hines expired, so, too, did his non-competition agreement, enabling him to work in the same line of work.  Accordingly, we cannot say that the trial court abused its discretion in its determination of husband's earning capacity.

Second, husband claims that the court incorrectly assessed wife's expenses with respect to the ownership of Edgewood Farm. The two mortgages against the property totaled $694,793.94, and the monthly payments totaled $7,327.  Husband contends that the court, in determining a monetary award, should not have considered the amount of the mortgage payments.  Husband is especially concerned since wife sold Edgewood Farm prior to the entry of the court's decree, thereby eliminating an expense of $7,327 per month.

In its award of real property to wife, the trial judge wrote, "Edgewood Farm with the adjoining 84 acres, . . . is to be transferred to Ms. Iverson, and she will assume any indebtedness secured by the same and hold Mr. Iverson harmless from the [sic] these debts."  Later, in the award of spousal

-

support, the court considered wife's needs and wrote, "In addition to the ongoing expenses and debts shown on the parties' exhibits, Ms. Iverson, as the recipient of the marital home, Edgewood Farm, will have reoccurring monthly payments due to the mortgage on that property." The court then awarded her a sum of $1,700 per month.

We have held that "while Code § 20-107.1 requires a chancellor to consider the provisions made with regard to the marital property under Code § 20-107.3, we view that requirement as a practical means by which the chancellor may fix a proper spousal support award in light of the financial result of the monetary award." Gamble, 14 Va. App. at 577, 421 S.E.2d at 646. In Gamble, this Court held that the chancellor abused his discretion by fashioning a spousal support award that effectively required the husband to satisfy the mortgage obligations on the marital home he was required to convey to his wife. See id. at 577, 421 S.E.2d at 647. However, in this case, an award of $1,700 per month clearly does not equal the $7,327 monthly mortgage payment assumed by wife for Edgewood Farm. Accordingly, the trial court properly considered the financial result of the monetary award of Edgewood Farm. Changed circumstances may serve as a basis for future modification; however, we cannot say that the trial court was plainly wrong or without evidence to support its decision at the time it was made.

-

Finally, husband contends that the court failed to determine the income that would be generated by the equitable distribution award. According to husband, the court did not consider the income that wife will receive from the monetary award, from the rental or sale of the St. Martin villa, or from the income earned on the proceeds of the sale of Edgewood Farm.

We disagree. The trial court noted that "each party will realize income generated from the assets each receives under the court's equitable distribution award." The court made a comprehensive listing of the assets and specific findings of value. It carefully considered the appropriate awards and explained, to our satisfaction, its rationale in distributing the income producing assets. Thus, the trial court did consider the equitable distribution award in determining spousal support.

Finding no reversible error, the decree is affirmed.

<u>Affirmed</u>.

-